IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EARTH ISLAND INSTITUTE and          )
CENTER FOR BIOLOGICAL DIVERSITY,    )      2:11-cv-00402-GEB-DAD
                                    )
            Plaintiffs,             )
                                    )      ORDER GRANTING DEFENDANTS'
      v.                            )      MOTION FOR SUMMARY JUDGMENT
                                    )      AND DENYING PLAINTIFFS'
NANCY GIBSON, in her official       )      MOTION FOR SUMMARY JUDGMENT
capacity as Forest Supervisor       )
for the Lake Tahoe Basin            )
Management Unit, and UNITED         )
STATES FOREST SERVICE, an agency    )
of the Department of                )
Agriculture,                        )
                                    )
            Defendants.             )
_____     )

        Pending are cross-motions for summary judgment on all claims

in Plaintiffs' First Amended Complaint ("FAC"). Plaintiffs challenge the

United States Forest Service's ("Forest Service") Angora Fire

Restoration Project ("Angora Project"), alleging it violates the

National Forest Management Act ("NFMA") and National Environmental

Policy Act ("NEPA"). Plaintiffs seek declaratory relief that the Forest

Service and Defendant Nancy Gibson (collectively referred to as the

"Forest Service") violated NFMA and NEPA, and also request that the

Court "[v]acate [the Forest Service's] Angora Project Decision and

remand to the agency for further proceedings consistent with the opinion

of the Court; or . . . [e]njoin [the Forest Service] from awarding or

implementing the Angora Project" as planned. (FAC 19:2-4.) For the

1 reasons stated herein, the Forest Service's motion for summary judgment

2 is granted, and Plaintiffs' motion for summary judgment is denied.

**I. Legal Standard**

3

4 **A. Administrative Procedure Act ("APA") Standard of Review**

5          "Because NFMA and NEPA do not provide a private cause of

6 action to enforce their provisions, agency decisions allegedly violating

7 NFMA and NEPA are reviewed under the [APA]." Native Ecosystems Council

8 v. United States Forest Serv. (Ecosystems I), 428 F.3d 1233, 1238 (9th

9 Cir. 2005). "Under the APA, [a court] may set aside an agency decision

10 if it is 'arbitrary, capricious, an abuse of discretion, or otherwise

11 not in accordance with law.'" Id. (quoting 5 U.S.C. § 706(2)(A)). A

12 decision is arbitrary and capricious only if an agency "relied on

13 factors Congress did not intend it to consider, entirely failed to

14 consider an important aspect of the problem, or offered an explanation

15 that runs counter to the evidence before the agency or is so implausible

16 that it could not be ascribed to a difference in view or the product of

17 agency expertise." Hapner v. Tidwell, 621 F.3d 1239, 1244 (9th Cir.

18 2010).

   **B. NFMA**

19

20          The National Forest Management Act . . .
         provides both procedural and substantive
21       requirements. Procedurally, it requires the Forest
         Service to develop and maintain forest resource
22       management plans. After a forest plan is developed,
         all subsequent agency action . . . must comply with
23       NFMA and the governing forest plan. Substantively,
         NFMA requires that forest plans provide for
24       diversity of plant and animal communities based on
         the suitability and capability of the specific land
25       area.

26 Earth Island Instit. v. Carlton, 626 F.3d 462, 469-70 (9th Cir. 2010)

27 (quoting Ecology Ctr. v. Castaneda, 574 F.3d 652, 656 (9th Cir. 2009).

         A 1982 NFMA rule ("1982 rule") "requires the Forest Service to

28 identify and monitor [MIS] and directs that 'fish and wildlife habitat

2

1   shall be managed to maintain viable populations of existing native and
2   desired non-native vertebrate species.'" Castaneda, 574 F.3d at 657
3   (quoting 47 Fed. Reg. 43048 (Sept. 30, 1982)). The Forest Service can
4   satisfy this requirement of the 1982 rule by using "habitat as a
5   proxy[,]" meaning "the Forest Service . . . must both describe the
6   quantity and quality of habitat that is necessary to sustain the
7   viability of the species in question and explain its methodology for
8   measuring this habitat." The Lands Council v. McNair, 537 F.3d 981, 994
9   (9th Cir. 2008) (en banc) (overruled on other grounds by Am. Trucking
10  Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 n.10 (9th Cir.
11  2009)). "However, [the 1982 rule] . . . was partially superceded in
12  2000[,]" and "[t]he requirements of the superceded 1982 [r]ule apply
13  *only to the extent they were incorporated into the Forest Plan*."
14  Carlton, 626 F.3d at 470 (quoting Castaneda, 574 F.3d at 657).

15  **C. NEPA**

16      "NEPA is a purely procedural statute, intended to protect the
17  environment by fostering informed agency decision-making." Hapner, 621
18  F.3d at 1244. "NEPA . . . does not mandate particular results, but
19  simply provides the necessary process to ensure that federal agencies
20  take a hard look at the environmental consequences of their actions."
21  High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 639 (9th Cir. 2004)
22  (internal quotation marks omitted).

23      "NEPA requires agencies to prepare a detailed environmental
24  impact statement ('EIS') for all 'major Federal actions significantly
25  affecting the quality of the human environment.'" Hapner, 621 F.3d at
26  1244 (quoting 42 U.S.C. § 4332(C)). "'As a preliminary step, the agency
27  may prepare an Environmental Assessment ('EA') to determine whether the
28  environmental impact of the proposed action is significant enough to

1  warrant an EIS.'" Id. (quoting High Sierra Hikers, 390 F.3d at 639-40).

2  "An EA must include 'brief discussions' of the need for the proposal, of

3  reasonable alternatives, and of the anticipated environmental impacts."

4  Id. (quoting 40 C.F.R. § 1508.9(b)). "If the agency concludes there is

5  no significant effect associated with the proposed project, it may issue

6  a [Finding of No Significant Impact] in lieu of preparing an EIS."

7  Envtl. Prot. Info. Ctr. v. United States Forest Serv., 451 F.3d 1005,

8  1009 (9th Cir. 2006).

9                              **II. Background**

10          The Angora Fire was a human-caused fire that began in June of

11  2007 on National Forest System lands in the Lake Tahoe Basin Management

12  Unit ("LTBMU"). (Administrative Record ("AR") 550.) "The Angora fire

13  burned over 3,100 acres, including approximately 2,700 acres of NFS

14  lands, all within the Wildland Urban Interface (WUI) Defense Zone[.]"

15  (AR 550.) The Angora Project was conceived, inter alia, to "reduce the

16  amount of dead and downed trees that resulted from the Angora fire," in

17  order "to reduce long-term fuel loading to reduce future fire severity."

18  (AR 661.)

19          The LTBMU is managed in accordance with the LTBMU Land and

20  Resource Management Plan ("LTBMU Forest Plan"), which was approved in

21  1988 and "has been amended several times." (AR 568.) One amendment was

22  the 2007 Sierra Nevada Forests Management Indicator Species Amendment,

23  in which the Blacked-backed Woodpecker ("BBWP") was chosen as a

24  Management Indicator Species ("MIS") for the habitat of "Snags in Burned

25  Forest[.]" (AR 6133, 6135.) "An MIS is a species chosen by the Forest

26  Service to represent a much larger group of native species with similar

27  habitat requirements for environmental assessment purposes." Earth

28  Island Instit. v. Carlton, 626 F.3d 462, 467 n.1 (9th Cir. 2010). BBWPs

4

1   "are dependent on snags created by stand-replacement fires." (AR 860.)

2   "The abundant snags associated with severely burned forests provide both

3   prey . . . and nesting sites" for BBWPs. (AR 860.)

4            The Forest Service issued its initial EA for the Angora

5   Project in March of 2010. (AR 253.) Plaintiffs submitted comments in

6   response to the initial EA. (AR 622, 628.) In July of 2010, the Forest

7   Service issued the Final EA, as well as a Decision Notice and Finding of

8   No Significant Impact ("FONSI"); the FONSI approved the Angora Project.

9   (AR 550, 635.) Under the Angora Project, 61.6 percent "of suitable BBWP

10  habitat . . . within the [Angora Project] area would be treated" through

11  the Forest Service's removal of both live and dead trees. (AR 863.)

12  "[A]n average of four of the largest diameter snags would be retained"

13  in the treated areas. (AR 864.) The treated areas "represent[] 0.5% of

14  the total acres of 211,000 acres that severely burned in the Sierra

15  Nevada Bioregion between 2001 and 2007." (AR 867.) The Angora Project

16  area also would include "12 Wildlife Snag Zones, which . . . . would

17  receive minimal to no treatment and are being retained as habitat for a

18  diverse set of species including the BBWP." (AR 865.) Most of the live

19  and dead trees logged in the Angora Project area "will be hauled . . .

20  for disposal at . . . biomass energy facilities." (AR 901.)

21                           **III. Discussion**

22           Plaintiffs allege the Forest Service violated NFMA by

23  "fail[ing] to ensure the viability of the [BBWP] as required by the 1988

24  LTBMU Forest Plan[.]" (FAC ¶ 67.) Plaintiffs also allege the Forest

25  Service violated NEPA by 1) not properly considering proposed

26  alternatives to the Angora Project in the final EA; 2) failing to insure

27  the scientific integrity of the final EA; 3) failing to properly respond

28  to "responsible scientific opinion which counsels against the [Angora

Project] and/or calls into question the potential environmental effects of the [Angora Project;]" and 4) failing to take the requisite "hard look" in the final EA at "the adverse effects [the Angora Project] will have on the [BBWP], future fire behavior, and climate change." (FAC ¶¶ 77, 80.)

**A. NFMA**

Plaintiffs argue the LTBMU Forest Plan incorporated the viability requirement of the 1982 NFMA rule, and that the Forest Service did not ensure the viability of the BBWPs. Specifically, Plaintiffs argue that "the Forest Service has neither described the quantity and quality of habitat necessary to sustain [BBWPs] in the LTBMU planning area, nor identified the minimum viable population levels." (Pls.' Mot. 12:17-19.) Plaintiffs argue the LTBMU Forest Plan incorporated the 1982 rule's viability requirement, and support this argument by citing to the following language in Chapter III of the LTBMU Forest Plan: "Management Indicator Species[:] The Forest Service must manage habitat to, at the least, maintain viable populations of existing native and desired nonnative species." (AR 4485.) Plaintiffs also cite to a portion of Chapter IV of the LTBMU Forest Plan where a "Predicted Condition" is identified as follows: "Viable populations of native and desired nonnative species will be maintained through active vegetative management and other methods." (AR 4503.) Plaintiffs also cite to the following portion of Chapter IV: "Practice Description" . . . "The primary purpose is to perpetuate viable populations of wildlife species native to the area through management of their habitat." (AR 4518.)

The Forest service counters it interprets the LTBMU Forest Plan as not requiring it to assess the viability of the BBWP in accordance with the 1982 rule's viability requirement, and that its

interpretation is entitled to deference. The Forest Service argues nothing in the LTBMU Forest Plan "explicitly invoke" the 1982 rule. (Defs.' Reply 5:21-22.) The Forest Service also argues that none of the specific "Practice Standards and Guidelines" for management of wildlife habitat prescribed in the LTBMU Forest Plan require the Forest Service to assess the viability of the BBWP in accordance with the 1982 rule's viability requirement. The Forest Service further argues that the provisions of the LTBMU Forest Plan cited by Plaintiffs are "descriptive rather than prescriptive[,]" and therefore are insufficient to incorporate the 1982 rule's viability requirement. Id. 6:14.

         "Agencies are entitled to deference to their interpretation of their own . . . Forest Plans[,]" unless the interpretation "is plainly inconsistent with [a Forest Plan]." Native Ecosystems Council v. United States Forest Serv., 418 F.3d 953, 960 (9th Cir. 2005). A court "will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." McNair, 559 F.3d at 994.

         Here, the Forest Service did not make "a clear error in judgment in concluding" that the LTBMU Forest Plan did not require it to assess the viability of the BBWP in accordance with the 1982 rule's viability requirement. Id. None of the specific "Practice Standards and Guidelines" in the LTBMU Forest Plan clearly indicate that the Forest Service was required to assess the viability of the BBWP in accordance with the 1982 rule's viability requirement (AR 1373-1381, 4518-19); nor have Plaintiffs cited to any specific standard or guideline in the LTBMU Forest Plan that could be interpreted to incorporate the viability

requirement. See Carlton, 626 F.3d at 470 (finding that forest plan did not contain viability requirement applicable to BBWP when forest plan did not "contain[] *specific provisions* regarding wildlife viability") (emphasis added). Therefore, it has not been shown that the Forest Service violated NFMA, and summary judgment is granted in the Forest Service's favor on this issue. Id. at 470-71 (finding that forest plan provision stating that "the forest management approach chosen 'will provide the fish and wildlife habitat and other ecological conditions necessary to maintain well-distributed viable populations of vertebrate species in the planning area, and maintain the diversity of plants and animals'" did not "clearly" incorporate viability requirement of 1982 rule); cf. Castaneda, 574 F.3d at 660 ("'[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations.'") (quoting Terbush v. United States, 516 F.3d 1125, 1139 n. 7 (9th Cir. 2008)).

## B. NEPA

### 1.  Consideration of Alternative Actions

Plaintiffs argue as follows that the Forest Service failed to properly consider alternative actions to the Angora Project. Plaintiffs argue the Forest Service improperly dismissed from consideration an alternative action prohibiting the removal of snags greater than 16 inches in diameter ("16-inch alternative"), since the Forest Service assumed that "all snags fall" within 20 years when analyzing this alternative but did not rely on this assumption when considering other alternatives. Further, Plaintiffs argue the Forest Service "biased and prejudiced" its analysis of the 16-inch alternative by erroneously asserting that large woody fuels, which are pieces of wood greater than

three inches in diameter (AR 2855), and small woody fuels contribute equally to future fire intensity, behavior, and type. (Pls.' Reply 16:8.) Lastly, Plaintiffs argue the Forest Service "biased the assessment of alternatives" by not disclosing that future potential fire intensity would be lower under a "No Action" alternative than it would be under the Angora Project. Id. 18:1-2.

The Forest Service counters that it properly dismissed the 16-inch alternative despite applying the "all snags fall" assumption when analyzing the 16-inch alternative but not the other alternatives, since the 16-inch alternative did not meet the Angora Project's purpose. The Forest Service also argues it acknowledged a difference between large and small woody fuels when addressing the 16-inch alternative, and that it was unnecessary for it to focus on fire intensity when comparing the "No Action" alternative to the Angora Project.

NEPA "requires federal agencies to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.'" Ecosystems I, 428 F.3d at 1245 (quoting 42 U.S.C. § 4332(2)(E)). "This 'alternatives provision' applies whether an agency is preparing an [EIS] or an [EA], and requires the agency to give full and meaningful consideration to all reasonable alternatives." N. Idaho Cmty. Action Network v. United States Dep't of Transp., 545 F.3d 1147, 1153 (9th Cir. 2008) (quoting Ecosystems I, 428 F.3d at 1245). "Alternatives that do not advance the purpose of [a project] will not be considered reasonable or appropriate." Ecosystems I, 428 F.3d at 1247.

Here, the Forest Service did not violate NEPA's alternatives provision as Plaintiffs argue. The Forest Service properly dismissed the

16-inch alternative from detailed consideration, even though it applied the "all snags fall" assumption when analyzing this alternative and did not apply this assumption when considering the other alternatives. The 16-inch alternative was not addressed in the initial EA; only the proposed action (which became the Angora Project) and the No Action alternative were analyzed. The Forest Service considered the 16-inch alternative in the final EA based on comments received on the initial EA, but dismissed the 16-inch alternative from detailed analysis since it would not meet the Angora Project's purpose of "reducing long-term fuel loadings[.]" (AR 678.) Under these circumstances, the Forest Service's application of the "all snags fall" assumption to the 16-inch alternative does not constitute a NEPA violation, since "'[t]he Forest Service [i]s entitled to identify *some* parameters and criteria . . . for generating alternatives to which it would devote serious consideration. Without such criteria, an agency could generate countless alternatives.'" Resources Ltd., Inc. v. Robertson, 35 F.3d 1300, 1307 (9th Cir. 1993) (quoting Idaho Conservation League v. Mumma, 956 F.2d 1508, 1522 (9th Cir. 1992)).

Further, the Forest Service acknowledged a difference between large and small woody fuels when analyzing the 16-inch alternative. In dismissing the 16-inch alternative, the Forest Service concluded there would be "high or even extreme resistence to [fire] control" if snags greater than 16 inches in diameter were not removed, since "high amounts of *coarse* woody debris leads to high or even severe resistence-to-control[.]" (AR 678 (emphasis added).) Moreover, elsewhere in the final EA the Forest Service stated: "Excessive *small* woody debris from small trees and limbs of larger trees increase a fire's rate of spread and fire line intensity, reducing the ability of firefighters to suppress

the fire and increasing the ultimate fire size." (AR 654-55 (emphasis added).) Each of these conclusions is supported by a Forest Service 2003 James K. Brown, et al. ("Brown study") study, which is cited in the EA and states, in pertinent part:

> Small and large downed woody fuels contribute differently to the various elements of fire hazard.
>
> . . . .
>
> The influence of small woody fuels (3 inches and less in diameter) on spread rate and intensity of surface fires and associated torching and crowning is substantial . . . . Large woody fuels have little influence on spread and intensity of the initiating surface fire in current fire behavior models; however, they can contribute to development of large fires and high fire severity. Fire persistence, resistance-to-control, and burnout time (which affects soil heating) are significantly influenced by loading, size, and decay state of large woody fuel.

(AR 2858.)

Nor has it been shown that the Forest Service biased its assessment of alternatives by not focusing on fire intensity when it compared the No Action alternative to the Angora Project. A stated purpose of the Angora Project is to "reduce future fire *severity*[,]" (AR 661 (emphasis added)), and the Brown study states: "Fire intensity . . . is not a reliable indicator of fire severity[.]" (AR 2858.)

Plaintiffs also argue that the Forest Service violated NEPA's alternatives provision by not giving any consideration whatsoever to a proposed alternative that would prohibit the removal of snags greater than 15 inches in diameter. "NEPA does not require federal agencies to consider alternatives that are substantially similar to other alternatives." Ecosystems I, 428 F.3d at 1249.

1    For the stated reasons, the Forest Service did not violate

2   NEPA's alternatives provision, and summary judgment is granted in the

3   Forest Service's favor on this issue.

4   **2.    Insuring Scientific Integrity of EA**

5    Plaintiffs argue the Forest Service failed to insure the

6   scientific integrity of the final Angora Project EA in two ways. "First,

7   the . . . EA . . . misrepresented the findings of a 2006 study by Hutto

8   and Gallo[.]" (Pls.' Mot. 18:5.) "Second, the EA misrepresented the

9   facts regarding [BBWP] population distribution '[t]rend[.]'" <u>Id.</u>

10  18:21-22 (quoting AR 867.) The Forest Service rejoins that its

11  "description of the [Hutto and Gallo] study, although imperfect, was not

12  material in any way to the disclosure of impacts from the Project."

13  (Defs.' Mot. 19:19-20.) The Forest Service also argues it "appropriately

14  concluded that the [BBWP's] population distribution was stable[.]" <u>Id.</u>

15  21:1-3.

16    Under NEPA, "[a]gencies shall insure the professional

17  integrity, including scientific integrity, of the discussions and

18  analyses in [EISs]."  40 C.F.R. § 1502.24. "The Ninth Circuit applies

19  this standard to EAs as well as EIS's." <u>Earth Island Inst. v. Morse</u>, No.

20  2:08-cv-01897-JAM-JFM, 2009 WL 2423478, at *6 (E.D. Cal. Aug. 5, 2009)

21  (citing <u>Idaho Sporting Congress v. Thomas</u>, 137 F.3d 1146, 1152 (9th Cir.

22  1988). "Because analysis of scientific data requires a high level of

23  technical expertise, courts must defer to the informed discretion of the

24  responsible federal agencies." <u>Earth Island Inst. v. United States</u>

25  <u>Forest Serv.</u>, 351 F.3d 1291, 1301 (9th Cir. 2003). In addition, "[t]he

26  reviewing court may not 'fly speck' an [EA] and hold it insufficient on

27  the basis of inconsequential, technical deficiencies." <u>Oregon Envtl.</u>

28  <u>Council v. Kunzman</u>, 817 F.2d 484, 492 (9th Cir. 1987) (quoting <u>Nw.</u>

Indian Cemetery Protective Ass'n v. Peterson, 795 F.2d 688, 695 (9th Cir. 1986)).

Here, the Forest Service did not materially misrepresent the Hutto and Gallo study. This study states, in pertinent part:

> [S]ix of eight woodpecker species [including the BBWP] nested only in unlogged burned forest; they were entirely absent from salvage-logged areas.

> . . . .

> In conclusion, the cavity-nesting bird community as a whole was clearly negatively affected by salvage logging in our study area in the early years following stand-replacing fire, and the main problem for primary cavity-nesting bird species does not appear to have been availability of snags as nest sites. Rather, the reduction in numbers of trees that harbored important food sources seemed to be the detriment of the most fire-dependent cavity-nesting bird species.

(AR 2127, 2131.) The pertinent part of the EA addressing the Hutto and Gallo study states:

> The 713 untreated acres of suitable BBWP habitat within the analysis area would be retained and available to support 16 to 23 territories, assuming a territory size of 30-62 acres. . . . Likewise, treatment in the 1,149 acres could reduce potential BBWP territories by 18 to 32 territories. Although Hutto and Gallo . . . found fewer BBWP nests in salvage-logged plots than in unlogged plots . . . , they concluded that this was a matter of reduction in food source . . . rather than nest site availability. Thus, while live and dead tree removal would occur within suitable habitat, the extent to which this reduces nesting habitat is not entirely predictable.

(AR 864.) Plaintiffs contend it was inaccurate for the Forest Service to state Hutto and Gallo found *fewer* BBWP nests in salvage logged plots than in unlogged plots when their study states nests "were *entirely absent* from salvage-logged areas." (AR 2127 (emphasis added).) However, even if it was inaccurate for the Forest Service to use the word

13

"fewer," it is evident that this inaccuracy was "inconsequential." Kunzman, 817 F.2d at 492. It is also evident that the Forest Service otherwise accurately represented the Hutto and Gallo study in the EA, then reached conclusions about BBWP nesting based on the findings of the Hutto and Gallo study.

The Forest Service also did not misrepresent facts concerning BBWP distribution. The EA states: "[D]ata indicate that [BBWPs] continue to be distributed across the Sierra Nevada; current data at the rangewide, California, and Sierra Nevada scales indicate that the distribution of [BBWP] populations in the Sierra Nevada is stable." (AR 867.) This conclusion is supported by a study cited in the EA that provides BBWP distribution data over a 25-year period and concludes: "The data from these various sources indicate that [BBWPs] continue to be distributed across the Sierra Nevada." (AR 1453.)

Therefore, the Forest Service did not fail to insure the scientific integrity of the EA as Plaintiffs allege, and summary judgment is granted in the Forest Service's favor on this issue.

**3.   Forest Service's Response to Responsible Opposing Views**

Plaintiffs argue the Forest Service violated NEPA's requirement under 40 C.F.R. § 1502.9(b) ("§ 1502.9(b)") to respond to "responsible opposing view[s]," since it did not appropriately respond to four comments submitted by Dr. Chad Hanson in response to the initial EA. However, the Forest Service was not required by § 1502.9(b) to respond to Dr. Hanson's comments since: "The duty to disclose and respond to 'responsible opposing viewpoints' imposed by 40 C.F.R. § 1502.9(b) *applies only to environmental impact statements, not environmental assessments*." N. Slope Borough v. Minerals Mgmt. Serv., 343 Fed. Appx. 272, 275 (9th Cir. 2009) (emphasis added).

14

1   Assuming arguendo that § 1502.9(b) applies in this action, the

2   Forest Service did not violate this NEPA regulation. Plaintiffs contend

3   the Forest Service failed to appropriately respond to the following four

4   comments submitted by Dr. Hanson: 1) the initial EA misrepresented the

5   Hutto and Gallo study's conclusion concerning BBWP nesting in logged

6   areas; 2) the initial EA misrepresented several reports to support the

7   Forest Service's conclusion that distribution of BBWP populations in the

8   Sierra Nevada is stable; 3) the Brown study concluded that woody

9   material larger than 10 inches in diameter has no significant influence

10  on future fire behavior or intensity; and 4) the Angora Project would

11  threaten the viability of the BBWP, and the Forest Service was required

12  to assess the viability of the BBWP in accordance with the viability

13  requirement of the 1982 NFMA rule. (AR 3684, 3686-88.) The Forest

14  Service counters it adequately responded to Dr. Hanson's comments in the

15  body of the final EA and in the "Response to Comments" section of the

16  FONSI.

17  Under § 1502.9(b), an agency "must respond explicitly and

18  directly to conflicting views[.]" Carlton, 626 F.3d at 472 (internal

19  quotation marks omitted). "However, agencies have broad discretion in

20  choosing how to respond to opposing scientific evidence." Id.

21  The Forest Service appropriately responded to Dr. Hanson's

22  comments concerning the Hutto and Gallo study in the body of the final

23  EA by discussing the findings of that study. (AR  864.)

24  The Forest Service also appropriately responded in the FONSI

25  to Dr. Hanson's comments concerning the distribution of BBWP populations

26  as follows:

27          The EA provides an analysis of the short-term and
            long-term effects to the [BBWP] (section 3.6.4).
28          Detailed information on habitat conditions at the
            Sierra Nevada bioregional scale can be found in the

1      SNF bioregional MIS report (Project Record Document
       E67). . . . Monitoring data indicate that [BBWPs]
2      continue to be distributed across the Sierra
       Nevada; current data at the range-wide, California,
3      and Sierra Nevada scales indicate that the
       distribution of [BBWP] populations in the Sierra
4      Nevada is stable.

5  (AR 627.) Although Dr. Hanson may disagree with this response, "that

6  disagreement does not render the Forest Service's review and comment

7  process improper." <u>Carlton</u>, 626 F.3d at 473.

8          The Forest Service also appropriately responded to Dr.

9  Hanson's comment concerning the Brown study in the body of the final EA,

10  stating: "A study by Brown et al. . . . acknowledges that leaving high

11  amounts of *coarse* woody debris leads to high or even severe resistence-

12  to-control [of fires]." (AR 678 (emphasis added).) As discussed above,

13  the Brown study supports this statement.

14         Lastly, the Forest Service appropriately responded in both the

15  final EA an FONSI to Dr. Hanson's comments concerning the viability of

16  the BBWP. Specifically, the Forest Service stated in the final EA that

17  distribution of BBWP populations in the Sierra Nevada is stable, and

18  also that "[t]he forecast for increasing stand replacing fires for the

19  foreseeable future across a significant part of the western United

20  States indicates an increase in BBWP habitat availability for continued

21  BBWP population growth." (AR 867, 873-74.) In the FONSI, the Forest

22  Service responded to Dr. Hanson's comments concerning the need to assess

23  the viability of the BBWP by stating: "This request is beyond the scope

24  of this analysis. . . . MIS are monitored at the Sierra Nevada

25  bioregional scale. Information gathered at the bioregional scale is

26  ongoing, will continue over multiple years and will support conclusions

27  made about species status and trends." (AR 627.)

28

1    Therefore, the Forest Service did not violate § 1502.9(b)'s

2    requirement to respond to "responsible opposing views," and summary

3    judgment is granted in the Forest Service's favor on this issue.

4    **4.   Hard Look at Impacts on BBWPs, Future Fire Behavior, and Climate**

5    **Change**

6    Plaintiffs argue the that Forest Service failed to take a hard

7    look at the Angora Project's impact on BBWPs and future fire behavior.

8    However, Plaintiffs have not shown that the Forest Service consideration

9    of these issues violated NEPA.

10    Plaintiffs also argue the Forest Service failed to take a hard

11    look at the Angora Project's impact on climate change in the final EA

12    since 1) the Forest Service "fail[ed] to describe the methodology it

13    used to calculate [greenhouse gas] emissions or the data upon which

14    those calculations are based[;]" and 2) the Forest Service "failed to

15    evaluate all direct and indirect [greenhouse gas] emissions from the

16    Angora [P]roject." (Pls.' Mot. 26:19-20, 28:11-12.) The Forest Service

17    counters that it took a hard look at the Angora Project's climate change

18    impact since the final EA addresses climate change in proportion to its

19    significance, and since the Forest Service's choice of which greenhouse

20    gas emissions to evaluate is entitled to deference.

21    "Through the NEPA process, a federal agency must 'take[ ] a

22    'hard look' at the potential environmental consequences of the proposed

23    action.'" Oregon Natural Res. Council v. United States Bureau of Land

24    Mgmt., 470 F.3d 818, 820 (9th Cir. 2006) (quoting Klamath-Siskiyou

25    Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir.

26    2004)). However, NEPA only requires an agency to focus on "issues that

27    are truly significant to the action in question," and to discuss

28    environmental impacts "in proportion to their significance." 40 C.F.R.

1   §§ 1500.1(b), 1502.2(b). Further, courts are to be "'most deferential'
2   when the agency is 'making predictions, within its [area of] special
3   expertise, at the frontiers of science.'" McNair, 537 F.3d at 993

4          Here, although greenhouse gas emissions "are the main source
5   of accelerated climate change[,]" (AR 900.), the Forest Service
6   concluded: "it is not possible to determine the cumulative impact on
7   global climate change from emissions associated with any number of
8   particular projects. Nor is it expected that such disclosure would
9   provide a practical or meaningful effects analysis for project
10  decisions." (AR 3438.) Accordingly, the final EA's climate change
11  discussion, which includes a computation of the estimated greenhouse gas
12  emissions from the Angora Project, (AR 904-05), and concludes that
13  "[greenhouse gas] emissions . . . are not significant issues[,]" (AR
14  906.), discusses the Angora Project's climate change impact in
15  proportion to its significance. See Hapner, 621 F.3d at 1245 (concluding
16  the Forest Service "adequately considered [a logging] [p]roject's impact
17  on global warming in proportion to its significance" even though the
18  Forest Service did not discuss climate change in the EA, but only
19  "addressed comments regarding climate change in its . . . notice of
20  final decision"). Additionally, the Forest Service's decision as to
21  which sources of greenhouse gas emissions to consider in the final EA is
22  entitled to deference, since the Forest Service "does not have an
23  accepted tool for analyzing all [greenhouse gas] emissions." (AR 3437.)

24         Therefore, Plaintiffs have not shown that the Forest Service
25  failed to take a hard look at the Angora Project's impacts on BBWPs,
26  future fire behavior, and climate change; and summary judgment is
27  granted in the Forest Service's favor on these issues.

28                          **IV. Conclusion**

1        For the stated reasons, the Forest Service's motion for

2  summary judgment is granted, and Plaintiffs' motion for summary judgment

3  is denied. Judgment shall be entered in favor of Defendants.

4  Dated:  July 13, 2011

5

6                                    _____
                                     GARLAND E. BURRELL, JR.

7                                    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28